# United States Court of Appeals for the Federal Circuit

2007-5077


USA CHOICE INTERNET SERVICES, LLC,

Plaintiff-Appellee,

v.


UNITED STATES,

Defendant-Appellant.



H. Christopher Bartolomucci, Hogan & Hartson L.L.P, of Washington, DC, argued for plaintiff-appellee.  Of counsel on the brief was Anthony C. Gulotta, Anderson & Gulotta, P.C., of Harrisburg, Pennsylvania.

Teresa E. McLaughlin, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant.  With her on the brief were Eileen J. O'Connor, Assistant Attorney General; Richard T. Morrison, Deputy Assistant Attorney General; Gilbert S. Rothenberg and Arthur T. Catterall, Attorneys.

Appealed from:  United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

2007-5077

USA CHOICE INTERNET SERVICES, LLC,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 05-CV-525, Judge Charles F. Lettow.

_____

DECIDED: April 15, 2008

_____

Before LINN, DYK, and MOORE, Circuit Judges.

Opinion for the court filed by Circuit Judge LINN. Opinion concurring in part and dissenting in part filed by Circuit Judge DYK.

The government appeals from a final judgment of the United States Court of Federal Claims following an order granting USA Choice Internet Services, LLC ("USA Choice") a refund of communications excise taxes paid from January 1999 through April 2002 on various communication services purchased from local telephone companies. USA Choice Internet Servs., LLC v. United States, 73 Fed. Cl. 780 (2006). Because we hold that USA Choice's incoming-only phone lines meet the definition of "local telephone service," 26 U.S.C. § 4252(a), and because none of the lines at issue fall within the "private communication service" exception, § 4252(d), we reverse.

## I. BACKGROUND

USA Choice is an Internet Service Provider (ISP) that provides "dial-up" Internet access to residential and business customers in Pennsylvania. See generally Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 974–75 (2005) (contrasting "dial-up" Internet access with "broadband" service, and noting that "[t]he traditional means by which consumers in the United States access the network of interconnected computers that make up the Internet is through 'dial-up' connections provided over local telephone facilities. Using these connections, consumers access the Internet by making calls with computer modems through the telephone wires owned by local phone companies" (internal citations omitted)). USA Choice provided network access servers equipped with modems at several locations throughout Pennsylvania known as Points of Presence (POPs).

During the relevant time period, customers would connect to USA Choice's servers by using computer modems to dial a local telephone number or "access number" associated with one of these POPs. One of the network server modems would answer this incoming call and establish a connection between the computers; this connection required telephonic quality to successfully facilitate communication. USA Choice, 73 Fed. Cl. at 783. Subsequent to establishing a telephonic quality connection between a USA Choice network server modem at the POP and a dial-up customer's computer modem, the following communication took place: USA Choice's server requested a username and password; the response was compared to USA Choice's records; and if the user could be confirmed, USA Choice provided a connection to the Internet through its network. Upon several failed authentication attempts, however,

USA Choice's modem would instead disconnect the call.  Id.  Because neither USA Choice nor the telephone companies blocked incoming calls from subscribers who were not USA Choice's customers, anyone could dial one of the ISP access numbers and connect at least briefly to one of USA Choice's POPs.  If the caller used a regular telephone instead of a modem, however, he or she might hear a set of electronically-generated beeps before being disconnected.  Id.  This accessibility allowed USA Choice's customers to connect to its servers from any telephone number, provided they used valid usernames and passwords.

Dial-up customers connect to the local telephone company, known as a local exchange carrier (LEC), through a standard analog phone line known as "POTS," an acronym for "Plain Old Telephone Service."  By comparison, USA Choice's POPs connected to the LECs via dedicated circuits consisting of a group of digital communications channels purchased by USA Choice from telephone companies including ALLTEL, Sprint, Verizon, and Verizon's predecessor entities GTE and Bell Atlantic.  Id. at 781.  The majority of these digital lines were generally known as Primary Rate Interface (PRI or PRA) circuits.  These lines could carry 23 simultaneous communications, which could all be associated with a single local telephone number.  Id. at 784.  Other services purchased by USA Choice included Digital Channel Services (DCS) and Basic Rate Interface (BRI or BRA) circuits.  Id. at 786–87.

At issue in this case are excise taxes levied on these lines connecting USA Choice's POPs to the local telephone companies.  Id. at 782–83.  Section 4251(a)(1) of the Internal Revenue Code imposes a three percent excise tax on "communications services," which include "local telephone service."  26 U.S.C. § 4251(b)(1)(A).  Section

4252(a) defines "local telephone service" as, <u>inter</u> <u>alia</u>, "access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system." § 4252(a)(1). "Local telephone service" excludes "toll telephone service" and "private communication service," which are defined in subsections (b) and (d) respectively. <u>See</u> § 4252(a).

USA Choice filed a refund request with the Internal Revenue Service (IRS) on May 24, 2002. After the IRS disallowed this request, USA Choice filed suit in the Court of Federal Claims on May 5, 2005. USA Choice argued that the services at issue fall outside the scope of § 4251(a)(1) because incoming-only lines do not meet the definition of "local telephone service" in § 4252(a)(1), and, alternatively, because they meet the "private communication services" exclusion from taxation as defined in § 4252(d). It also presented argument pertaining to excise taxes on long distance service not relevant to this appeal. The Court of Federal Claims held a trial in July 2006 and also considered post-trial briefing and argument. The Court of Federal Claims ultimately issued an opinion granting USA Choice the majority of the refund it desired, holding that USA Choice's incoming-only lines were not "local telephone service" under § 4252(a)(1) and that nearly all of the remaining contested lines met the "private communication service" exception of § 4252(d). <u>USA Choice</u>, 73 Fed. Cl. at 802. The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Standard of Review

"In reviewing a final decision of the Court of Federal Claims after a trial, we review legal conclusions de novo, and we review factual findings under the clearly erroneous standard. A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (internal citations and quotation marks omitted). "Statutory interpretation is a question of law that we review de novo." Wesleyan Co. v. Harvey, 454 F.3d 1375, 1378 (Fed. Cir. 2006). Additionally, "[t]he proper application of the tax laws to an undisputed set of operative facts is a question of law, over which we exercise plenary review." Lockheed Martin Corp. v. United States, 210 F.3d 1366, 1370 (Fed. Cir. 2000).

### B. Analysis

#### 1. Local Telephone Service

The Court of Federal Claims held that those lines that were incoming-only—i.e., lines that did not permit outbound calls—did not meet the definition of local telephone service and thus were taxed improperly. USA Choice, 73 Fed. Cl. at 795. Not all of USA Choice's lines were found to be truly incoming-only, however, and these other lines were analyzed under the "private communication service" provision, discussed infra.

On appeal, the government argues that the statutory text does not preclude treatment of incoming-only lines as local telephone service and that the self-imposed

restrictions placed by USA Choice on communications over these lines were irrelevant to its "privilege" to use the underlying service, which is subject to the excise tax. The government also urges us to defer to various IRS Revenue Rulings under Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984). USA Choice argues that the Revenue Rulings do not bind us and responds to the government by asserting that its incoming-only lines could not provide it with "access to a local telephone system," nor the privilege of "communication with" substantially all other subscribers, because it could not affirmatively initiate calls. It further contends that because it disconnected calls from subscribers without modems and from persons who are not customers, it did not communicate with "substantially all" subscribers in the local system.

### a. Access to a Local Telephone System

The statute provides:

> (a) Local telephone service.—For purposes of this subchapter, the term "local telephone service" means—
>> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
>> (2) any facility or service provided in connection with a service described in paragraph (1).
> The term "local telephone service" does not include any service which is a "toll telephone service" or a "private communication service" as defined in subsections (b) and (d).

26 U.S.C. § 4252(a). "In construing a statute, we begin with its literal text, giving it its plain meaning." Hawkins v. United States, 469 F.3d 993, 1000 (Fed. Cir. 2006). We begin with the requirement that local telephone service provide "access to a local telephone system." § 4252(a)(1). The Court of Federal Claims found this "access"

prong unhelpful and thus did not rely on it. USA Choice, 73 Fed. Cl. at 791–92. It found that dictionary definitions of "access" could be read in multiple ways and that our prior decision in Trans-Lux Corp. v. United States, 696 F.2d 963 (Fed. Cir. 1982) (interpreting "access" in the context of teletypewriter exchange service, which is also subject to the communications excise tax and is defined in section 4252(c)), did not address the "directionality of messages." USA Choice, 73 Fed. Cl. at 791.

On appeal, USA Choice argues that this prong presents an alternative ground for affirmance. It argues, as it did to the Court of Federal Claims, that "access" connotes the right to enter, and that because USA Choice can only passively receive incoming calls, it cannot "affirmatively enter" the local telephone system. USA Choice also relies on our observation in Trans-Lux that a particular device providing access to the Telex network allowed subscribers to "direct-dial any other network subscriber." 696 F.2d at 964. The government responds that another common definition of "access" is "the ability to obtain or make use of." It also asserts that Trans-Lux stands for the opposite proposition by citing the following discussion of the technological meaning of the word access in that opinion: "From the weight of the credible evidence, the trial judge determined that the word access was recognized in the communications field in general, and with respect to the Telex network in particular, as meaning the interface or connection between the Telex network's transmission lines (and the central exchange) and the [customer terminal]." Id. at 965 (emphases added).

We agree that general dictionary definitions of "access" provide little insight. Definitions contemporaneous with the introduction of this statutory language include restrictive language implying a right to enter as well as broad language merely requiring

the ability to make use of something. Webster's Third New International Dictionary 11 (1961) (defining "access" as, inter alia, "permission, liberty, or ability to enter, approach, communicate with, or pass to and from," "freedom or ability to obtain or make use of," and "a way by which a thing or place may be approached or reached"). Our decision in Trans-Lux, however, which involved a very similar and related subsection of the same statute, informs that the "technological meaning of the word access . . . in the communications field in general . . . mean[s] the interface or connection between . . . the central exchange and the [customer terminal]." 696 F.2d at 965. Because this provision is so closely related to the definition at issue, and because the language of this prong is so similar, compare § 4252(a)(1) ("the access to a local telephone system"), with § 4252(c) ("the access from a teletypewriter or other data station to the teletypewriter exchange system"), we find this interpretation of "access" persuasive in concluding that "access" simply means connectivity. See Finnegan v. Leu, 456 U.S. 431, 438 n.9 (1982) ("Certainly one would expect that if Congress had intended identical language to have substantially different meanings in different sections of the same enactment it would have manifested its intention in some concrete fashion."). We recognize that the Trans-Lux opinion ultimately addressed a different legal issue, but this broad recognition of general industry understanding likely indicates that the "directionality of messages" bears no relation to the term "access" in the statute. We turn then to the second prong of the statutory definition of local telephone service.

b. The Privilege of Telephonic Quality Communication

The Court of Federal Claims held that USA Choice did not enjoy "the privilege of telephonic quality communication with substantially all persons having . . . telephone

stations constituting a part of such local telephone system," § 4252(a)(1) (emphasis added), on its incoming-only lines because it could not choose to initiate communications with whomever it chose to call, USA Choice, 73. Fed. Cl. at 795, and because "with" does not encompass "single-direction communications," id. at 792.[1] The government devotes the majority of its appeal to arguing that this language is consistent with incoming-only service and that the Court of Federal Claims erred by holding otherwise.

USA Choice argues that Congress must have intended "with" to require the ability to communicate "to and from" other telephone subscribers based on the contrasting statutory language used in an adjacent subsection. Specifically, the definition of "toll telephone service," requires "the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having . . . telephone stations in a specified area which is outside the local telephone system area." § 4252(b)(2) (emphasis added). USA Choice contends that without the ability to initiate calls, it did not enjoy the "privilege of communicating with" other local subscribers, and that construing this language to encompass incoming-only lines would impermissibly import the allegedly broader language of subsection (b)(2). See O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1361 (Fed. Cir. 2000) ("In light of Congress' choice of different language in subsections of the same statute, it would be inappropriate to construe the narrower language that Congress chose for the prohibition as if it were equivalent to the broader language that Congress chose for the

---

[1] The Court of Federal Claims also held that USA Choice's use of computer modems and password authentication limited its ability to communicate with other subscribers, USA Choice, 73 Fed. Cl. at 793–95, which we discuss infra.

exemptions."). It further argues that Congress must have intended to impose these directional restrictions in the statute because subsection (b)(2) was amended specifically to include Wide Area Telephone Service (WATS), which at the time could only be used to make outbound calls.

The Court of Federal Claims agreed with USA Choice and held that while "[t]he words 'to or from' capture single-direction communications . . . the word 'with' connotes reciprocity." USA Choice, 73 Fed. Cl. at 792 (citing Webster's Seventh New Collegiate Dictionary 1026 (1970) (indicating that "with" is "used as a functional word to indicate one to whom a usu[ally] reciprocal communication is made" (alteration in original))). Even if we accept this conclusion, however, it does little to resolve the underlying dispute. After all, most telephone calls, including communications negotiated by computer modems, involve reciprocal communication once a connection has been established. For example, "I spoke with Jane on the phone" does not indicate who initiated the conversation. As another Court of Federal Claims decision dealing with nearly identical facts correctly observed, interpreting this statute "requires [us] to recognize that 'inward dialing' and 'one-way communication' are not synonymous phrases; that . . . once a call was initiated, two-way communication occurred over lines that supported telephonic quality communication." Comcation, Inc. v. United States, 78 Fed. Cl. 61, 72 (2007). While the "access" prong of the statute is focused on connectivity, the "communication with" prong refers to what happens after that connection is established. The issue therefore is whether two-way communication existed on USA Choice's incoming-only lines after a call was initiated. Here, even the authentication process demonstrates that two-way communication occurred during

connections to USA Choice's network servers because a server communicated requests for usernames and passwords, which were communicated back to the server by the subscribers who dialed the access number.

Nor does Congress' use of different prepositions in subsection (b)(2) compel the narrow reading of subsection (a)(1) advanced by USA Choice. A more natural reading of the statute indicates that this distinction likely relates to grammatical—rather than substantive—context. Subsection (a)(1) refers to "communication [singular] with" in the abstract, while subsection (b)(2) is framed in terms of "an unlimited number of . . . [individual] communications [plural] to or from." Even accepting USA Choice's argument, however, would not compel a different result. Because the privilege of "communication with" another party requires only the possibility of two-way communication after a call is initiated, as discussed above, the distinction USA Choice reads into the use of "communication with" instead of "communications to or from" is irrelevant to the outcome of this case.

A review of the legislative history behind this language further supports our conclusion that Congress did not intend for local telephone service to turn on the ability to make outbound calls. Congress first levied excise taxes on telephone services as part of the Spanish War Act of 1898, and since that time has updated, modified, repealed, and extended the communications excise tax numerous times. See generally OfficeMax, Inc. v. United States, 428 F.3d 583, 585–86 (6th Cir. 2005). The language at issue in this case originates in Congress' 1965 amendment to sections 4251 and 4252 as part of the Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, § 302, 79 Stat. 136, 145–46 (1965), which created the "local telephone service" category as a

successor to the "general telephone service" category defined in 1958 as part of the Excise Tax Technical Changes Act of 1958, Pub. L. No. 85-859, § 133, 72 Stat. 1275, 1289–90 (1958). See S. Rep. No. 89-324 (1965), as reprinted in 1965 U.S.C.C.A.N. 1690, 1725 ("The definition[] of local telephone service (previously general telephone service) . . . ha[s] been updated and modified to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied."); H.R. Rep. 89-433 (1965), as reprinted in 1965 U.S.C.C.A.N. 1645, 1676 (same). As we observed in Trans-Lux, one of the primary motivations for this amendment was the creation of the "private communication services" exemption. See 696 F.2d at 967. Another motivation was the aforementioned desire to shift the focus of the tax to the services rather than the equipment being provided. Additionally, as observed in Comcation, the definition of general telephone service was redesignated "local telephone service," and the definition of "toll telephone service" was updated to clarify that WATS was included in toll telephone service and excluded from local telephone service. 78 Fed. Cl. at 71–72 (and cites therein). USA Choice argues that this change indicates a desire to exclude services that could be initiated only by one party from the "local telephone service" category.

First, there is no indication that the pre-1965 definition of "general telephone service" was in any way related to the ability to make outgoing calls. Prior to 1965, section 4252 defined "general telephone service" as

> any . . . telephone service furnished in connection with any . . . telephone station which may be connected (directly or indirectly) to an exchange operated by a person engaged in the business of furnishing communication service, if by means of such connection communication may be established with any other . . . telephone station.

26 U.S.C. § 4252(a) (1964). The legislative history surrounding the creation of this previous language indicates that the ability to originate calls was not essential. See S. Rep. No. 85-2090 (1958), as reprinted in 1958 U.S.C.C.A.N. 4395, 4440 ("If the existing facilities may be so connected [as described in section 4252(a)], it is immaterial that the practice of the subscriber is not to make such connections, or that the person engaged in the business of furnishing communication service denies permission to the subscriber to make such connections."). Because the definition of local telephone service was designed to track the earlier definition of "general telephone service" with the exceptions noted, and because the services purchased by USA Choice are neither WATS nor private communication services as discussed infra, we see no reason to infer that Congress meant to impose other new limitations on local telephone service related to call initiation.

Second, although USA Choice argues that the amendment of the toll telephone service definition to include WATS indicates an intent to remove any incoming-only or outgoing-only lines from the definition of local telephone service, we find no support for this argument. The House and Senate Reports clarify that WATS is included in toll telephone service, but their description of this service notably excludes any mention of restrictions on incoming or outgoing calls. See S. Rep. No. 89-324 (1965), as reprinted in 1965 U.S.C.C.A.N. 1690, 1725 ("This is a long-distance service whereby, for a flat charge, the subscriber is entitled to make unlimited calls within a defined area (sometimes limited as to the maximum number of hours)."); H.R. Rep. 89-433 (1965), as reprinted in 1965 U.S.C.C.A.N. 1645, 1677 (same). These reports also discuss local telephone service without even mentioning the allegedly critical "communication with

substantially all persons" language. See S. Rep. No. 89-324 (1965), as reprinted in 1965 U.S.C.C.A.N. 1690, 1725 ("[I]n the case of local telephone service, the definition makes it clear that it is the right of access to a local telephone system and the privilege of telephonic quality communication which is taxed together with facilities or services provided with this service."); H.R. Rep. 89-433 (1965), as reprinted in 1965 U.S.C.C.A.N. 1645, 1676–77 (same). Moreover, the inclusion of "with" in the 1965 amendments cannot be accorded any significance as it relates to the prior statutory text because the replaced text similarly recited "communication may be established with any other . . . telephone station." 26 U.S.C. § 4252 (1964) (emphasis added). Accordingly, the more logical reading of the statutes and legislative histories indicates that the purpose of the 1965 amendments with respect to WATS related to the flat-rate long distance characteristics of the service rather than to any limitations related to directionality.

As previously mentioned, the Court of Federal Claims also held that USA Choice did not enjoy the privilege of communication with "substantially all persons having . . . telephone stations," because its POP servers could only "communicate" with subscribers who used a modem. USA Choice, 73 Fed. Cl. at 793–94. The Court of Federal Claims further held that even if substantially all of the relevant subscribers used modems to call USA Choice, there would be no "communication" with non-customers before they were disconnected by USA Choice's servers because "[t]he transmission of the identification request is so limited that it cannot be considered to be a 'telephonic quality communication' in the ordinary sense of those words." Id. at 794–95. USA Choice presents several arguments defending these determinations, while the

government responds that USA Choice's position improperly focuses on actual use instead of the "privilege" of use specified in the statute.

USA Choice's arguments ignore evidence that these use restrictions relate solely to USA Choice's own self-imposed limitations. USA Choice's decision to connect these lines to modems in its network servers rather than to telephones through equipment "such as a multiplexor or PBX," see id. at 794 n.24, "though perfectly understandable for a commercial ISP—resulted in self-imposed limits that did not fundamentally alter the nature of the services that [USA Choice] had the 'privilege' to use," Comcation, 78 Fed. Cl. at 65. USA Choice's configuration decision no more limited the underlying service's capabilities than would a subscriber's choice to connect a facsimile machine rather than a telephone set to his or her telephone line.[2] Furthermore, as the Court of Federal Claims found in this case, a successful connection between one of USA Choice's server modems and another subscriber's modem required telephonic quality. USA Choice, 73 Fed. Cl. at 783. This telephonic quality connection was established even where authentication ultimately failed and USA Choice consequently disconnected the call. Id. at 795 n.26. As with its choice to utilize modems, USA Choice cannot alter the inherent

---

[2] The Court of Federal Claims observed that if USA Choice wished to use its lines for voice communications, its "channel or circuit would also have to be configured by the provider to allow use of" voice-capable equipment. USA Choice, 73 Fed. Cl. at 794 & n.24. However, in this case, uncontradicted testimony offered by the government indicates that such provision of equipment by USA Choice would be the only configuration necessary. See id. This conclusion is further supported by the Court of Federal Claims' finding that in order for USA Choice's modems to function, "[t]elephonic quality"—i.e., "a communication channel over which it [i]s possible to have a two-way conversation with the use of telephones"—"is required." Id. at 783 & n.7 (alterations in original).

Regardless, USA Choice bore the burden to show that its lines were not appropriately configured.

capabilities of the communication services it purchased merely by establishing a system for disconnecting calls with subscribers other than its customers.

It is undisputed that "privilege" implicates either a "right" or "legal freedom" rather than actual use. See id. at 792; see also Comcation, 78 Fed. Cl. at 65 ("Nothing about the word 'privilege' connotes that the service purchased must actually be used by the taxpayer in the fashion covered by the excise tax."). The Court of Federal Claims noted that "USA Choice agrees 'that it is a line's actual capabilities, not its use, that govern . . . taxability." USA Choice, 73 Fed. Cl. at 795 (quoting USA Choice's post-trial reply brief) (alteration in original); see also Comdata Network, Inc. v. United States, 21 Cl. Ct. 128, 131 (1990) (holding that the toll telephone tax applied because the plaintiff had "the right to utilize the telephone lines to communicate [in accordance with § 4252(b)(2)]. That the service may not, in fact, be so used by plaintiff is irrelevant to the existence of the privilege"); accord Rev. Rul. 79-245, 1979-2 C.B. 380 ("Where a telephone service provides the subscriber the privilege of telephonic quality communication with substantially all other subscribers to the local telephone system, it is immaterial whether the subscriber exercises the privilege."). This focus on the nature of the service comports with the legislative history of the Excise Tax Reduction Act of 1965, which indicates that "[t]he definition[] of local telephone service . . . ha[s] been updated and modified to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied." S. Rep. 89-324 (1965), as reprinted in 1965 U.S.C.C.A.N. 1690, 1725. Here, it is undisputed that anyone could call USA Choice's access numbers and at least briefly connect, and that it was USA Choice's decision to

implement modems and to enforce user logins to trigger disconnects that precluded further reciprocal communication.

For the foregoing reasons, we hold that neither the inability to place outgoing calls, nor the choice to communicate using computer modems, nor the password authentication scheme employed by USA Choice excludes the communication services it purchased from the definition of "local telephone service" subject to the communications excise tax of section 4251(a)(1).

We note that our holding does not conflict with revenue rulings in which the IRS has held incoming-only lines subject to the communications excise tax. See, e.g., Rev. Rul. 77-196, 1977-1 C.B. 343 ("In defining taxable local telephone service, section 4252(a)(1) makes no distinction between systems that provide access to a local telephone network only by receiving calls and systems that both receive and originate calls. . . . Accordingly, the fact that . . . [the system at issue] can only receive incoming calls from a local telephone system is not material to the tax determination." (citing Rev. Rul. 75-102, 1975-1 C.B. 351)). Thus, we need not address the extent of deference—if any—properly accorded to these rulings. See generally W. Co. of N. Am. v. United States, 323 F.3d 1024, 1032 (Fed. Cir. 2003) (noting that "revenue rulings merely represent the position of the United States and do not bind this court," but that we "may refer to . . . revenue rulings for guidance and accept that reasoning in whole or in part to assist [our] understanding of the language of the revenue code").

Nor do our interpretations of the "access" and "communication with" prongs render either prong of section 4252(a)(1) superfluous or redundant. See, e.g., Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 209 (1997) ("Statutes must be interpreted, if

possible, to give each word some operative effect."). The words "access" and "communication" must be viewed within the context of the statute. See, e.g., Davis v. Mich. Dep't of the Treasury, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The second prong is not rendered superfluous because the "communication" prong requires "telephonic quality," whereas the "access" prong only requires connectivity. Nor is the connectivity connoted by "access" encompassed within the "communication" requirement of the second prong. The statute requires "access to a local telephone system" and "telephonic quality communication with substantially all persons having . . . telephone stations constituting a part of such local telephone system." § 4252(a)(1) (emphases added). We need look no further than the next subsection of the statute to find an example of services providing "communication with" subscribers to a local telephone system but not "access" to that local system. Section 4252(b) explicitly provides that toll telephone service "entitles the subscriber . . . to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having . . . telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located." § 4252(b)(2). Thus, toll telephone service provides "communication with" members of a local telephone system despite not having direct access to that local system. As another example, in the recent Vonage case, we described how "[s]ince 2002 Vonage has provided telephone service to its subscribers through Voice over IP ('VoIP') technology. . . . Vonage's system uses the internet to transmit telephone signals, rather than using the traditional public

switched telephone network ('PSTN'). When Vonage subscribers place calls to non-subscribers on the PSTN, Vonage's system transmits the signals through the internet, and then relays them to the PSTN." Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1298 (Fed. Cir. 2007).

Although toll telephone services and VoIP technology can be said to indirectly access at least the local telephone network of the recipient, arguments that this qualifies as "access" under section 4252(a)(1) have been consistently rejected by other courts. For example, in OfficeMax, "the government argue[d] that OfficeMax's plan must be a service provided in connection with a local telephone service because all long-distance services eventually require access to local telephone systems." 428 F.3d at 599–600. The court rejected this argument and held that "the definition of local-telephone service requires 'access to a' local telephone system, not 'access to every' local telephone system included within the boundaries of a long-distance plan." Id. at 600; accord Reese Bros., Inc. v. United States, 447 F.3d 229, 241 (3d Cir. 2006); Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1338 (11th Cir. 2005); Am. Online, Inc. v. United States, 64 Fed. Cl. 571, 582–83 (2005). Thus, in at least some circumstances, one can have "the privilege of telephonic quality communication with" persons in various local telephone systems without having "access" to those systems under the statute. Accordingly, this prong of the definition retains independent meaning under our interpretation of "access."

Finally, we are mindful of the principle that "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." Xerox Corp. v. United States, 41 F.3d 647, 658 (Fed. Cir. 1994) (quoting Hassett v. Welch, 303 U.S.

303, 314 (1938)). However, this is not such a case. "Here doubts which may arise upon a cursory examination of [the statutory provisions at issue] disappear when they are read, as they must be, with every other material part of the statute, and in the light of their legislative history." White v. United States, 305 U.S. 281, 292 (1938) (internal citation omitted); see also Irwin v. Gavit, 268 U.S. 161, 168 (1925) (noting that although "the tax laws should be construed favorably for the taxpayers . . . that is not a reason for creating a doubt or for exaggerating one").

## 2. Private Communication Service

Having concluded that USA Choice's lines provided "local telephone service," we must now turn to the Court of Federal Claims' decision that even the "local telephone service" lines were nonetheless exempt from the communications excise tax of § 4251(a)(1) because they met the requirements of a "private communication service." USA Choice, 73 Fed. Cl. at 798. Section 4252(d)(1) defines "private communication service" as:

> (1) the communication service furnished to a subscriber which entitles the subscriber—
>> (A) to exclusive or priority use of any communication channel or groups of channels,
>
> \* \* \*
>
> regardless of whether such channel, groups of channels, or intercommunication system may be connected through switching with a service described in subsection (a) [local telephone service], (b), or (c).

The statute also requires that "a separate charge is made for such service." § 4252(d).[3]

---

[3] The Court of Federal Claims held that USA Choice's non-incoming-only services met the statutory exception for private communication services with the exception of specific Verizon and Sprint services, which failed the "separate charge" requirement. USA Choice has not appealed the Court of Federal Claims' determination regarding these services. An affirmance of this ruling would require a remand for a

The Court of Federal Claims' analysis and the parties' arguments on appeal focus on the statutory requirement that a private communication service must "entitle [USA Choice] to exclusive or priority use of any communication channel or groups of channels." § 4252(d)(1)(A). The parties debate the similarity between the "private communication service" defined in the statute and industry definitions related to "private lines." USA Choice also argues that the statutory language clearly contemplates private communication systems connected to a local telephone exchange, that it did not have to share its lines to the local exchange—i.e., those lines only allowed calls to or from USA Choice's POPs, and that the legislative history indicates Congressional intent supporting a broad interpretation of this provision. The government's principal argument is that while an exempted private communication service may be connected with an LEC, the exemption does not extend to the very lines making that connection. Additionally, the government again contends that we should defer to IRS Revenue Rulings and makes various arguments based on the legislative history and a prior private communication service exemption. We conclude that the Court of Federal Claims erred in applying the private communication service exemption to the lines at issue in this case.

a.

The most significant shortcoming in the Court of Federal Claims' analysis is that it failed to recognize that USA Choice's lines did not serve to provide a distinct "<u>communication service</u> . . . regardless of whether [that service] may be connected through switching with a [local telephone service]." § 4252(d)(1) (emphasis added).

---

determination of whether the various incoming-only services met this requirement as well. Because we reverse, however, no such inquiry is necessary.

This statutory language requires that the system at issue provide a "communication service" beyond that of mere local telephone service, not just connectivity to the local telephone system itself. Dedicated lines that, alone or in combination with other privately owned or publicly shared equipment, do no more than furnish a subscriber with the ability to obtain local telephone service do not constitute the statutorily defined "private communication service" entitled to the exemption of § 4252(d)(1). As contrasted with typical private lines, PBX systems, Centrex systems, and answering service switchboard systems in existence at the time this statutory provision was enacted, all of which could be characterized as having communication channels that facilitated communications services beyond mere local telephone service, the lines at issue in this case served only to provide connectivity to the LEC and not to facilitate or provide any "communication service" that can be fairly characterized as "private."

The legislative history further supports our conclusion. The recommendations from the President accompanying the proposed legislation leading to the enactment of the language at issue stated that

> the tax on local and long-distance telephone service . . . will no longer apply to amounts paid for private communications systems even where the private system is linked with the general telephone network. This service is almost exclusively a business cost item and competes with nontaxable business communication services. Charges for service on the general telephone network originating or terminating in the private system would be taxable . . . .

Recommendations Relative to Excise and Fuel Taxes, H.R. Doc. No. 173, at 5 (1965) (emphasis added). Nothing in the subsequent legislative history indicates any disagreement by Congress with this recommendation, and the relevant language proposed in this document was substantively identical to the text as enacted. See id. at

16 (defining "private communication service" as, <u>inter alia</u>, "the communication service furnished to a subscriber . . . which entitles the subscriber to exclusive or priority use of any communication channel or groups of channels (regardless of whether such channel or groups of channels may be connected through switching with a [local telephone service] for which a separate charge is paid)").

More generally, "Congress enacted the private communication services exemption in order to correct the imbalance that had developed between telephone company-furnished services and subscriber-owned equipment," and in response to "telephone companies . . . losing business to companies that provided . . . equipment that could be purchased and operated by the users themselves." <u>Trans-Lux</u>, 696 F.2d at 967. This equipment comprised either "exclusive or priority use of any communication channel or groups of channels," § 4252(d)(1)(A), or an "intercommunication system," § 4252(d)(1)(B), but clearly excluded any connection to the LEC for the provision of local telephone service. Connection to the LEC was provided exclusively by the local telephone company in 1965. The local telephone company faced no competitive disadvantage as to connectivity with subscribers, and there was no competitive imbalance in that regard that cried out for legislative correction. Thus, while Congress clearly intended to remove "a severe handicap to the expanded use of . . . new and varied services," S. Rep. No. 89-324 (1965), <u>as reprinted in</u> 1965 U.S.C.C.A.N. 1690, 1726, it chose to do so <u>only</u> by removing "the tax on private communication systems," <u>id.</u>, not by exempting <u>any</u> new or varied telecommunication service that might be connected to the local telephone system—by dedicated lines or otherwise—from taxation. Accordingly, such services may qualify as "private

communication services" only if they meet the explicit definition provided in the statute. See, e.g., Luben Indus., Inc. v. United States, 707 F.2d 1037, 1041 (9th Cir. 1983) ("The general rule for construing tax statutes is that any doubt in the application of the statute is to be resolved in favor of the taxpayer. However, where the taxpayer attempts to bring itself within a tax exemption, as Luben is attempting to do in this case [involving contested federal excise taxes], doubt is to be resolved in favor of the Government.").

b.

USA Choice contended before the Court of Federal Claims and argues again on appeal that notwithstanding the fact that its lines served only to provide connections to the local telephone system, the "'specially configured' high-speed digital circuits" it chose to purchase necessarily provided the "exclusive or priority use" required by § 4252(d)(1)(A). Appellee Br. 56–57 (arguing that "USA Choice purchased dedicated line capacity for its sole use . . . [and that] no other telephone subscriber could use USA Choice's dedicated lines to establish a circuit terminating somewhere else" (emphasis omitted)). The Court of Federal Claims agreed, noting that "[t]hese were not lines where multiple telephone subscribers would share the same loop on an equal basis. USA Choice was not required to yield to anyone in its use of these communication channels." USA Choice, 73 Fed. Cl. at 800 (internal citation omitted). We disagree. While these statements may accurately describe aspects of USA Choice's dedicated multi-channel connections to the LEC, the fact remains that anyone else on the PSTN was free to dial USA Choice's access numbers and necessarily made use of USA Choice's dedicated lines to connect with its POPs. "USA Choice concedes . . . that anyone, whether in the local calling area or not, can 'call' the [access numbers] and

USA Choice's modem bank will 'answer' the call." Pl.'s Post-Trial Br. 21 (emphasis added). The fact that USA Choice did not have to share its digital connections to the LEC with other local subscribers did not entitle USA Choice to exclusivity or priority over the competing use of its communication channels by anyone dialing USA Choice's access numbers, even if USA Choice's lines were deemed a separate "communication service" under the statute—a conclusion with which we disagree.

USA Choice's lines fail not only the statutory requirement of "exclusive or priority use," but also the statute's definition of private communication service as "the communication service furnished to <u>a subscriber</u> which entitles <u>the subscriber</u> . . . to exclusive or priority use." § 4252(d)(1) (emphases added). The Court of Federal Claims held that because the dial-up customers used USA Choice's lines only "by dint of their relationship with USA Choice," the statutory requirement was met. <u>USA Choice</u>, 73 Fed. Cl. at 801. We disagree. Under the reasoning of the Court of Federal Claims, <u>any</u> business telephone line could be considered a private communication service if the subscriber chooses to use it exclusively to communicate with its customers. Closer questions may involve the use of lines connecting multiple offices or locations of a single subscriber through an LEC, <u>see generally</u> <u>Comcation</u>, 78 Fed. Cl. at 75, but we are not faced with that situation today. Here we consider lines that USA Choice admits provided access to its network servers from <u>any</u> telephone number, <u>see</u> Appellee Br. 9, and which we have held permitted at least limited communication with <u>any</u> subscriber. Accordingly, these lines fail to meet the statutory definition of "private communication service" even if we were to assume that "the subscriber" constructively included USA Choice's customers.

The Court of Federal Claims further erred in accepting USA Choice's argument that "by terminating a call when a caller fails to properly authenticate that he or she is a USA Choice customer, USA Choice demonstrates its priority of use." USA Choice, 73 Fed. Cl. at 800. Under this definition, any line could be construed as providing priority use. USA Choice's termination of calls upon failed authentication attempts does not meaningfully differ from the choice of any telephone subscriber to "hang up" upon receiving an unwanted call. Because we must focus on the inherent capabilities of the services provided to USA Choice as discussed supra, which indisputably allowed anyone to dial the telephone numbers associated with USA Choice's POPs and thus communicate with USA Choice's network servers through the local telephone system, USA Choice's unilateral decision to terminate calls received from non-customers cannot establish its "exclusive or priority use" of these services.

c.

In light of this analysis, we need not address arguments related to "private lines" or prior tax exemptions, neither of which we find particularly helpful. Finally, we note that—as with our "local telephone service" analysis—our conclusions present no conflicts with the revenue ruling relied upon by the government. See Rev. Rul. 78-437, 1978-2 C.B. 266 (holding that where a communication system meeting the definition of section 4252(d), "in addition to providing private communication between each of the stations in the system, also provides direct access from each station to local telephone service," the "charge for the lines that give access to the local telephone service . . . is not within the exemption provided by section 4252(d) of the Code").

We therefore hold that the communication services purchased by USA Choice do not meet the statutory definition of a "private communication service" and for that reason are not exempt from the communications excise tax of section 4251(a)(1).

## CONCLUSION

For the above reasons, we conclude that the Court of Federal Claims erred in holding that USA Choice's incoming-only lines were not subject to the communications excise tax as local telephone service and in holding that USA Choice's lines were exempt as private communication services, and thus its judgment is

<u>REVERSED</u>.

# United States Court of Appeals for the Federal Circuit

2007-5077

USA CHOICE INTERNET SERVICES, LLC,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 05-CV-525, Judge Charles F. Lettow.

DYK, <u>Circuit Judge</u>, concurring in part and dissenting in part.

I join the majority opinion with the exception of Part II.B.2.b. For the reasons stated by the majority, the services at issue constitute "local telephone service" within the definition of 26 U.S.C. § 4252(a)(1). They are not within the "private communication service" exemption of 26 U.S.C. § 4252(d) because they do not meet the basic requirement of providing a distinct "communication service" in addition to local telephone service. However, the majority alternatively holds that the "private communication service" exemption does not apply here because USA Choice does not have "exclusive or priority use" of its lines as required by 26 U.S.C. § 4252(d)(1)(A). I respectfully disagree with this alternative holding.

In reaching this alternative holding, the majority properly rejects the reasoning of the Court of Federal Claims that USA Choice's customers are "subscribers" within the language of the statute. USA Choice's customers may subscribe to the internet services offered by USA Choice, but they do not "subscribe" to the relevant telephone

company services at issue in this case. The only subscriber is USA Choice itself. However, USA Choice, as the subscriber, does have "exclusive or priority use" of its lines. In my view, USA Choice has "exclusive use" of its lines, because the lines cannot be used to direct calls to any other party. When a caller dials one of the telephone numbers associated with USA Choice's POPs, the call is routed at the central office over the dedicated circuits and to the POPs. Any call routed onto these circuits can only reach USA Choice.

The majority suggests that USA Choice does not enjoy exclusive or priority use of those lines because "anyone else on the [Public Switched Telephone Network] was free to dial USA Choice's access numbers and necessarily made use of USA Choice's dedicated lines to connect with its POPs." Maj. Op. at 24. I disagree. The statute focuses on the <u>subscriber's</u> entitlement, and here the subscriber is the only party who can be reached by a call routed over the lines at issue. PBX service, the very service for which the exemption was designed, similarly can enable the general public to reach the subscriber. A PBX system connected to the local exchange allows anyone to call in to and access the telephone stations within the system. Thus the exemption cannot be denied on the basis that the subscriber's use is not exclusive or priority use where the general public can use the lines to reach the subscriber.

While I believe that the "exclusive or priority use" requirement was satisfied, I nonetheless agree that the majority reaches the correct result in holding the exemption unavailable. In my view, the exemption is unavailable for the reasons stated in Part II.B.2.a of the majority opinion.